# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| **TREZJUAN THOMPSON,** | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 16-3287 |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

# ORDER

**AND NOW** this _____ day of _____, 2017, upon consideration of Defendant's Motion for Partial Dismissal and Plaintiff's Response in Opposition to Defendant's Motion, **IT IS ORDERED** that the Motion is **DENIED**.

**IT IS FURTHER ORDERED** that, pursuant to Fed. R. Civ. P. 12(a)(4)(A), Defendant shall file an Answer within fourteen days of the entry of this Order.

                                                                  **BY THE COURT:**

                                                                  **C. DARNELL JONES, II**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| **TREZJUAN THOMPSON,** | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 16-3287 |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL DISMISSAL

**I.   INTRODUCTION**

Plaintiff Trezjuan Thompson suffered a serious, but routine, injury when he ruptured his Achilles tendon while incarcerated in the Federal Detention Center-Philadelphia ("FDC"). FDC employees knew that Mr. Thompson would require special attention following surgical repair of the tendon. Despite that knowledge, they failed to ensure proper and timely follow-up care, and, as a result, left Mr. Thompson with a severely aggravated and disabling condition. Mr. Thompson has brought this suit against the United States under the Federal Tort Claims Act seeking a remedy for the damages he suffered due to the federal employees' actions and inactions which caused these harms.

Mr. Thompson's Complaint asserts three claims against the United States: negligence (Count I), negligent infliction of emotional distress ("NIED") (Count II), and intentional infliction of emotional distress ("IIED") (Count III). In its motion, the United States concedes that Mr. Thompson has properly pled a negligence claim in Count I and that the case may proceed to discovery on that Count. The United States seeks dismissal, however, of Counts II

and III based on its contention that the facts pled in the Complaint do not satisfy legal standards governing NIED and IIED claims. As demonstrated below, the United States' arguments ignore relevant and dispositive authority fully supporting Mr. Thompson's claims. The motion should be denied, and Mr. Thompson should be permitted to proceed to discovery on all claims asserted in the Complaint.

**II.   FACTS**

The facts pled in the Complaint, with all inferences drawn in the light most favorable to Mr. Thompson as the non-moving party, are as follows:

In July 2013, while incarcerated at the FDC, Mr. Thompson injured his right leg in a basketball game. Complaint at ¶ 9. After an emergency department evaluation and imaging studies, medical personnel at the FDC learned that Mr. Thompson had ruptured his right Achilles tendon. *Id.* at ¶ 10. A physician at Hahnemann Hospital in Philadelphia determined that surgery would be necessary to repair the ruptured tendon. *Id.* at ¶ 11. The recommended surgery took place on September 10, 2013. *Id.* at ¶ 12. Following the surgery, a cast was placed on Mr. Thompson's leg. *Id.* The surgeon who repaired Mr. Thompson's Achilles tendon informed correctional staff that Mr. Thompson should remain in the hospital overnight or longer for continued monitoring, but correctional staff would not permit Mr. Thompson to stay, stating that he was required to be immediately returned to the FDC. *Id.* at ¶¶ 13-14. Mr. Thompson was, therefore, returned to the FDC hours after the surgery was completed. *Id.* at ¶ 15.

The surgeon directed that Mr. Thompson be returned for a follow-up evaluation within five-to-seven days. *Id.* at ¶ 16. Further, the surgeon provided to correctional staff who removed Mr. Thompson from the hospital written instructions concerning the need for follow-up care and also stating that if Mr. Thompson's cast got wet or started to leak it should be removed and

replaced. *Id.* at ¶¶ 17-18. Correctional staff who received these written instructions provided them to FDC medical staff. *Id.* at ¶ 17.

About a week after his surgery, Mr. Thompson felt blood running out of his cast. *Id.* at ¶ 19. He reported the bleeding to at least four different medical staff members at the FDC, including a physician, a midlevel provider, a physician assistant, and a nurse. *Id.* Despite the alarming fact that Mr. Thompson had blood coming out of his cast a week after surgery and despite the surgeon's instructions to remove and replace the cast in such circumstances, none of the medical staff who learned of Mr. Thompson's condition took any action to evaluate or treat Mr. Thompson's leg. *Id.* at ¶ 20. Further, FDC medical staff failed to arrange for a follow up evaluation with the surgeon within five-to-seven days as directed by the surgeon, instead, they scheduled an appointment for September 24, 2013—*two weeks* after the surgery occurred. *Id.* at ¶ 21. In the two weeks that passed between the surgery and the scheduled follow-up appointment, FDC medical staff failed to conduct any evaluation of Mr. Thompson's surgically repaired leg, and provided him with no treatment. *Id.* at ¶ 22.

On September 24, 2013, FDC correctional staff took Mr. Thompson to the (belatedly scheduled) follow-up appointment, but, when they arrived at the surgeon's office, there was an apparent fire near the building; correctional staff declined to take Mr. Thompson into the building, and, instead, returned Mr. Thompson to the FDC. *Id.* at ¶¶ 23-24. Despite knowing that Mr. Thompson required a follow-up evaluation of his wounds, neither correctional staff nor medical staff attempted to immediately schedule a new follow-up appointment for Mr. Thompson. *Id.* at ¶ 26. For the next ten days, Mr. Thompson complained to correctional and medical staff that his surgical wounds were not healing, that he was experiencing substantial pain

3

and bleeding from the cast, and that he required treatment, but medical staff persisted in their failure to provide Mr. Thompson with any evaluation or treatment. *Id.* at ¶¶ 27-28.

A follow-up appointment with the surgeon finally occurred on October 4, 2013—three-and-a-half weeks after the surgery (two-and-a-half weeks after the recommended timeframe for a follow-up as directed by the surgeon). *Id.* at ¶ 29. At the follow-up appointment, the surgeon removed the cast and determined that the surgical wound was seriously infected and required that Mr. Thompson be readmitted to the hospital. *Id.* at ¶¶ 30-31. Upon his readmission, Mr. Thompson underwent at least three painful debridement procedures to treat the infection at the surgical site. *Id.* at ¶ 32. Additionally, due to the infection, physicians concluded that the first surgical repair of Mr. Thompson's ruptured Achilles tendon had failed and that a second surgery was required. *Id.* at ¶¶ 33-34. Mr. Thompson had the second surgery and remained hospitalized for *seven weeks*, until November 22, 2013. *Id.* at ¶¶ 34-35.

Mr. Thompson was returned to the FDC, but, due to residual effects of the infection caused by the delay in treatment following the first surgery, he continued to experience problems with his surgical wounds. *Id.* at ¶¶ 36-38. Mr. Thompson was hospitalized yet again on November 29, 2013 so that he could receive medical treatment for his persistent infection. *Id.* at ¶¶ 39-40. He remained hospitalized for one week, and was discharged back to the FDC on December 6, 2013, only to be, once again, returned to the hospital on December 10, 2013 due to continued problems with infection. *Id.* at ¶¶ 40-42. An additional two weeks of hospitalization followed for continued treatment of his surgical wound. *Id.* at ¶¶ 43-44.

Mr. Thompson's need for prolonged hospitalization was caused by the failures of FDC correctional and medical staff to ensure prompt and necessary treatment for Mr. Thompson following his surgery. *Id.* at ¶ 44. Because of persistent infection, multiple surgeries and

4

debridements, and the associated inability to rehabilitate what was an otherwise routine injury, Mr. Thompson was rendered disabled. *Id.* at ¶ 45. From the time of his hospitalizations through the present, Mr. Thompson experienced constant pain, discomfort, limited mobility and was required to use a wheelchair. *Id.* at ¶ 46. Additionally, due to the conduct described above, Mr. Thompson has suffered substantial emotional trauma. *Id.* at ¶ 49.

### III.   STANDARD OF REVIEW

Following the Supreme Court's decision in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), when the Court considers a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it conducts a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). First, the Court "must accept all of the complaint's well-pleaded facts as true." *Id.* at 210. Second, the Court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 129 S. Ct. at 1950). The "plausibility" analysis "will be 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 129 S. Ct. at 1949). In sum, the plausibility inquiry is not an exacting one. *See White v. Brommer*, 747 F. Supp. 2d 447, 457 (E.D. Pa. 2010) (citing *Fowler*, 578 F.3d at 210; *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)) (stating that Court must determine "whether, under any reasonable reading, the plaintiff may be entitled to relief" and noting that "a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits"); *see also Keahey v. Bethel Township*, No. 11-cv-7210, 2012 WL 478936, at *3 (E.D. Pa. Feb. 15, 2012) (following *Iqbal* the Federal Rules of Civil Procedure still "require[] only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations").

5

IV.     ARGUMENT

    A.     **The Complaint Pleads Sufficient Facts To Support A Claim Of Intentional Infliction Of Emotional Distress.**

Mr. Thompson's IIED claim has four elements: (1) the conduct at issue was "extreme and outrageous"; (2) it was "intentional or reckless"; (3) it caused emotional distress; and (4) the distress was "severe." *Williams v. Guzzardi,* 875 F.2d 46, 52 (3d Cir. 1989) (citing *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1273 (3d Cir. 1979) (*in banc*)).  The United States challenges Mr. Thompson's pleading concerning only the first element of the tort.  It contends that failures to act as alleged in this case can never be extreme and outrageous.  But, that is not the law.

Indeed, courts have regularly allowed IIED claims to proceed where the claim involves a negligent failure to provide appropriate medical treatment for someone in obvious need.  The decision in *Woolfolk v. Duncan*, 872 F. Supp. 1381 (E.D. Pa. 1995) (Padova, J.), is exemplary.  In that case, the plaintiff claimed that a primary care physician failed to provide him with medical benefits after he tested positive for HIV.  *Id.* at 1385.  The defendant physician contended on summary judgment, as the United States does here, that the mere failure to act in the face of needed treatment was not sufficiently outrageous or extreme to support an IIED claim.  *Id.* at 1391.  Judge Padova rejected that argument, stating: "I cannot conclude as a matter of law that [the] alleged failure to provide medical benefits was not sufficiently extreme."  *Id.*

In support of this conclusion, Judge Padova relied on other cases permitting IIED claims to proceed based on inactions or omissions.  *See Winterberg v. CNA Ins. Co.,* 868 F. Supp. 713, 716, 724 (E.D. Pa.1994) (refusing to dismiss IIED claim where doctor demanded that patient claiming neurological deficits walk, refused to help her up after she fell, and berated her after her fall); *Hoffman v. Memorial Osteopathic Hosp.*, 492 A.2d 1382, 1385-86 (Pa. Super. Ct. 1985)

6

(finding evidence sufficient to support favorable jury verdict on IIED claim where emergency room physician ignored patient's pleas for help after falling to the floor where patient was allowed to remain on the floor for more than an hour). These holdings are consistent with decisions from other jurisdictions finding failure to provide care extreme and outrageous. *See Howe v. Hull,* 874 F. Supp. 779, 790 (N.D. Ohio 1994) (finding physician's refusal to treat HIV-positive patient sufficient to support finding of extreme and outrageous conduct); *Miller v. Spicer,* 822 F. Supp. 158, 169–70 (D. Del. 1993) (same).

      A common thread running through the cited cases is that failures to act are more likely extreme or outrageous if the plaintiff and defendant actor were in a "special relationship." *Woolfolk*, 872 F. Supp. at 1391 (citing *Guzzardi,* 875 F.2d at 52). This was exactly the case for Mr. Thompson, who, as a prison inmate, was able to obtain necessary medical evaluation and treatment only if the United States' employees allowed him to do so. Indeed, several decisions authored by Judges of this Court have found that prison medical professionals' deliberate failures to provide needed care can be sufficiently outrageous to support IIED claims. *See Robinson v. Corizon Health, Inc.*, No. 12-1271, 2016 WL 7235314, at *16 (E.D. Pa. Dec. 13, 2016) (O'Neill, J.) (citing *Rodriguez v. Smith*, No. 03-3675, 2005 WL 1484591, at *9 (E.D. Pa. June 21, 2005); *Miller v. Hoffman*, No. 97-7987, 1999 WL 415397, at *9 (E.D. Pa. June 22, 1999)) (finding that prison medical defendants' knowing and deliberate failure to refer plaintiff for outside care for kidney cancer condition could be deemed outrageous).

      In view of these authorities, the failure to provide Mr. Thompson with care he obviously needed was extreme and outrageous. The FDC employees who knew of Mr. Thompson's condition were aware that Mr. Thompson required follow-up treatment with the surgeon who repaired his Achilles tendon, but they failed to take any action to ensure it was done within the

time period ordered by the surgeon.  They aggravated the consequences of this failure when, following correctional officers' refusal to take Mr. Thompson to an appointment because a fire near the surgeon's office somehow impeded their entrance, they again delayed in the scheduling of an appointment.  Most significantly of all, when Mr. Thompson complained of blood coming out of his cast—an obvious sign of improper healing of a surgical wound and possible infection—they ignored his requests for evaluation and treatment and allowed him to remain in the soiled cast.  And, they did no notwithstanding their having received discharge instructions specifically directing that Mr. Thompson's cast should be replaced if it started to leak.

At this early stage of the case, these facts demonstrating a marked disregard for Mr. Thompson's well being, especially in consideration of his inability to seek care on his own due to his "special relationship" with the federal employees charged with detaining him, are sufficient to show extreme and outrageous conduct necessary for an IIED claim.  The United States' request to dismiss that claim should be denied.

> **B.    The Complaint Pleads Sufficient Facts To Support A Claim Of Negligent Infliction Of Emotional Distress.**

The United States argues, first, that Mr. Thompson's NIED claim duplicates the damages sought via his negligence claim, and, second, that the Complaint does not plead sufficient physical harm resulting from the emotional distress.  Neither argument supports dismissal of this claim.

The United States' argument that Mr. Thompson's claim is duplicative is based on its position that NIED claims often focus on a plaintiff's observation of injury to close family members.  Although such facts certainly do support NIED claims, the claims are not exclusively limited to such factual situations as this is "only one scenario that supports a claim of negligent infliction of emotional distress." *Mulawka v. Pennsylvania*, No. 11-1651, 2012 WL 6864596, at

8

*13 (W.D. Pa. Nov. 28, 2012), *R & R adopted*, 2013 WL 171911 (W.D. Pa. Jan. 16, 2013). Indeed, Pennsylvania courts have recognized at least four different scenarios giving rise to an NIED claim, including, as relevant to this case, "situations where the defendant had a contractual or fiduciary duty toward the plaintiff." *Id.* (citing *Toney v. Chester County Hosp.,* 961 A.2d 192, 197–98 (Pa. Super. Ct. 2008) (en banc), *aff'd by equally divided court,* 36 A.3d 83 (Pa. 2011)). Based on this reasoning, allegations that a plaintiff who has a doctor-patient relationship with a defendant where the defendant fails to provide "adequate medical treatment," resulting in "physical injury and severe emotional distress," are "sufficient to state a claim for NIED." *Douglas v. Doe*, No. 10-5574, 2014 WL 4494969, at *10 (E.D. Pa. Sept. 12, 2014) (Surrick, J.) (citing *Mulawka*, 2012 WL 6864596, at *13). Mr. Thompson has alleged exactly such facts: the United States' employees were responsible for his care, these employees failed to ensure adequate treatment for him by arranging for prompt follow-up care with a surgeon and/or by evaluating his bleeding surgical wounds, and these failures cased him physical injury and several emotional distress.

As to the second point asserted in its motion, the United States is correct that Pennsylvania courts generally require that NIED claims be supported with allegations that the relevant emotional distress is manifested through physical symptoms. But, the required pleadings need not be extensive. Thus, in *Corbett v. Morgenstern*, 934 F. Supp. 680, 684 (E.D. Pa. 1996) (Padova, J.), the Court considered a complaint which pled, in relevant part, "Plaintiff has suffered severe psychological damage…and has suffered severe physical pain and mental anguish." These allegations, including the reference to "severe physical pain," were enough to meet the physical injury requirement for an NIED claim. *Id.* at 684-85. Mr. Thompson's Complaint meets this test as it alleges that Mr. Thompson "suffered severe emotional distress

9

which manifests itself in physical symptoms, including extreme pain and discomfort." Complaint at ¶ 56.[1]

Accordingly, because Pennsylvania law permits the litigation of NIED claims arising out of situations like the doctor-patient relationship present in this case and because Mr. Thompson pleads that his emotional distress is manifested in physical symptoms, the United States' request to dismiss this claim should be denied, and Mr. Thompson should be permitted to proceed to discovery regarding this claim.

## V.   CONCLUSION

For the foregoing reasons, Defendant United States' motion should be denied.

Respectfully submitted,

Date: January 5, 2017

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg
KAIRYS, RUDOVSKY, MESSING & FEINBERG
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400
(215) 925-5365 (fax)
*Counsel for Plaintiff*

---

[1] The quoted allegation is presented in the section of the Complaint alleging IIED, but that does not preclude consideration of the allegation with respect to other claims, including the NIED claim.  *See, e.g., TruePosition, Inc. v. LM Ericsson Telephone Co.*, No. 11-4574, 2012 WL 3584626, at *22-23 (E.D. Pa. Aug. 21, 2012) (Kelly, J.) (discussing need to view Complaint "in its entirety" and to review factual allegations "as a whole" without "dismembering them").

**CERTIFICATE OF SERVICE**

I, Jonathan H. Feinberg, hereby certify that on January 5, 2017 the foregoing Response In Opposition To Defendant's Motion For Partial Dismissal was filed via the Court's ECF system and thereby served upon counsel for Defendant United States of America:

> Michael S. Macko, Esq.
> Assistant U.S. Attorney
> 615 Chestnut Street
> Suite 1250
> Philadelphia, PA 19106-4476
> Michael.Macko@usdoj.gov

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg